## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK ACCOUNT 100051608592644 THAT IS STORED AT PREMISES CONTROLLED BY META PLATFORMS, INC. | No. 1:23-mj-00185-JCN **FILED UNDER SEAL** |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Christopher Concannon, being duly sworn, depose and state as follows:

### INTRODUCTION

1.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). I have been an ATF Special Agent for approximately 18 years. I am currently assigned to the ATF Boston Field Division – Portland Field Office. In my capacity as an ATF Special Agent, my duties include conducting criminal investigations concerning alleged violations of the Federal firearms laws, including those dealing with the straw purchasing and trafficking of firearms. In connection with such investigations, I routinely utilize Internet-based informational sources, particularly social media platforms, to include Facebook.[1] Based on my experience and training, users of Facebook—including subjects of prior investigations in which I have participated— utilize Facebook's private chat application, Messenger, in furtherance of firearms offenses, and additionally post details of themselves and their unlawful habits and activities on Facebook. I believe that to be the case here with respect to TYQUINN CANNON, who also uses the alias "Q," an individual who is presently the subject of an ATF investigation for violations of Title 18, United States Code, Sections 922(g)(1)

---

[1] In 2021, Facebook announced that it had changed its corporate name to "Meta Platforms, Inc." Facebook (the social network) has kept its name, and throughout my Affidavit I use "Facebook" for ease of reference.

(Felon in Possession), 932 (Straw Purchasing Conspiracy), and 933 (Trafficking in Firearms), and associated and related drug trafficking activity under Title 21.

2.      More specifically, I make this Affidavit in support of an application for a search warrant for information associated with a certain Facebook account believed to be used by TYQUINN CANNON **from May 1, 2022 through September 8, 2022**. The investigation has determined that, during this applicable time period, TYQUINN CANNON and others, known and unknown, were members of a criminal conspiracy that had, as one or more of its objects, the straw purchasing and trafficking of firearms from federal firearms licensees ("FFLs") in the District of Maine, and their related unlawful possession of firearms and distribution of controlled substances, including cocaine base and heroin. The ATF's investigation concerns the illegal activities of TYQUINN CANNON occurring from at least May through September 2022, as well as criminal conduct perpetrated by other members of the criminal conspiracy who also have committed related substantive offenses of federal criminal law, including but not limited to ABDULLAHI ISSAK (known as "T" or "Tony"), ADEN MOHAMED (known as "AD" or "Mike"), MOHAMED MOHAMED (known as "CJ"), ANGELICA GALARZA, RYAN BARRY, and BENJAMIN TURCOTTE. I hereby adopt and incorporate by reference my affidavit dated August 1, 2022, filed in support of a criminal complaint charging ABDULLAHI ISSAK with conspiracy to violate the federal firearms laws, among other crimes, attached hereto as ***Exhibit 1*** (1:22-mj-00129-JCN (D. Me.)); my affidavit dated August 8, 2022, filed in support of a criminal complaint charging RYAN BARRY with a violation of 18 U.S.C. § 922(a)(6), attached hereto as ***Exhibit 2*** (2:22-mj-00138-KFW (D. Me.)); and my affidavit dated September 1, 2022, filed in support of a criminal

2

complaint charging BENJAMIN TURCOTTE with a violation of 18 U.S.C. § 922(a)(6), attached hereto as ***Exhibit 3*** (2:22-mj-00149 (D. Me.)).

3.     My own personal investigation has determined that during the applicable time period, TYQUINN CANNON used Facebook and communicated with others by exchanging written messages via Facebook's Messenger application, with certain communications expressly concerning firearms and drug trafficking between Maine and central New York.

4.     The information sought by this search warrant is stored at premises owned, maintained, controlled, or operated by Facebook, a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in **Attachment A**. This Affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), to require Facebook to disclose to the Government records and other information in its possession, pertaining to the subscribers or customers associated with the account believed to be associated with TYQUINN CANNON. As detailed below, the Facebook Account Identifier believed to be associated with the Facebook account used by TYQUINN CANNON is 100051608592644.

5.     The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses, all of which I believe to be reliable. This Affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6.     Based on my training and experience and the facts as set forth in this Affidavit, there is probable cause to believe that violations of Title 18, United States

Code, Sections 922(g)(1), 932, and 933, and associated and related drug trafficking activity under Title 21, have been committed by TYQUINN CANNON, and that evidence of the same will be present in his Facebook account. There is probable cause to search the information described in **Attachment A**, as described in **Attachment B**.

### INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

7.      I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the Government copies of the records and other information (including the content of communications) associated with the Account Identifier described in **Attachment A**, particularly as described in Section I of **Attachment B**. Upon receipt of the information described in Section I of **Attachment B**, government-authorized persons will review that information to locate the items described in Section II of **Attachment B**.

### INVESTIGATION AND PROBABLE CAUSE

8.      I am presently investigating TYQUINN CANNON for the straw purchasing and trafficking of firearms from FFLs in the District of Maine, his unlawful possession of firearms, and his distribution of controlled substances, including cocaine base and heroin. The ATF's investigation concerns the illegal activities of TYQUINN CANNON occurring from at least May through September 2022, as well as criminal conduct perpetrated by other members of the criminal conspiracy who also have committed related substantive offenses of federal criminal law, including but not limited to those identified above.

9.      I have accessed and reviewed criminal record details pertaining to TYQUINN CANNON. Such records show that on about March 12, 2018, in Bureau

County (Illinois) Criminal Case No. 2017CF114, TYQUINN CANNON pled guilty and was convicted for felony Possession of a Controlled Substance (Cocaine) and felony Possession of Cannabis with Intent to Deliver (Class 1). TYQUINN CANNON was therefore a felon prohibited from possessing firearms at all relevant times. I have also accessed and reviewed criminal record details pertaining to ABDULLAHI ISSAK. Such records show that on about August 26, 2019, in Onondaga County, New York, Docket No. CO-2018-001480, ABDULLAHI ISSAK pled guilty and was convicted for felony Criminal Possession of Stolen Property in the Fourth Degree in violation of New York Penal Law 165.45(2). ABDULLAHI ISSAK was therefore a felon prohibited from possessing firearms at all relevant times.

10.     As it pertains to TYQUINN CANNON, on September 8, 2022, Massachusetts State Police personnel conducted a traffic stop of a vehicle driven by TYQUINN CANNON. As a result, found on his person inside a satchel was a firearm; three plastic "corner baggies" each containing a white powder;[2] and three bundles of wax paper baggies containing an off-white powder. The firearm—a Glock model 27Gen5 .40 caliber pistol bearing serial number BXDK781—was loaded with a round chambered.

11.     Through my investigation, I know that this firearm, the Glock model 27Gen5 .40 caliber pistol bearing serial number BXDK781, was purchased by a Confidential Source[3] on August 11, 2022, at G3 Firearms, an FFL located in Turner,

---

[2] At the Holden Barracks, Massachusetts State Police personnel determined that the substances seized comprised approximately 25 grams of suspected cocaine; 5 grams of suspected fentanyl; approximately 25 grams of MDMA; and approximately one pound of suspected marijuana. The substances were field tested by DEA Task Force Officer ("TFO") Jamie Vitale, who is a Massachusetts State Trooper assigned to the DEA's Boston Division Office.  The field tests resulted in presumptive positives for cocaine, MDMA and heroin-fentanyl.

[3] The Confidential Source admitted to straw purchasing five handguns on behalf of "Glizz"/"Mike."  The Confidential Source has not been charged to date.

Maine. I interviewed the Confidential Source on August 16, 2022, who admitted to straw purchasing the firearm for an individual known to the Confidential Source as "Glizz" and "Mike." I know that ABDULLAHI ISSAK uses the alias "Glizz," and that ADEN MOHAMED uses the alias "Mike." The Confidential Source stated to me that the Confidential Source had purchased the particular firearm at the request of "Glizz" / "Mike," who had provided the money for the purchase and directed the Confidential Source to make the purchase at G3 Firearms. The Confidential Source then transferred the firearm to "Glizz" / "Mike" that same day, paying the Confidential Source $200 for making the straw purchase.

12.     TYQUINN CANNON informed Massachusetts State Police personnel during a *Mirandized* interview that he purchased the gun for $700 in a private sale while up in Maine, and had driven from Maine to Massachusetts with the firearm. Later in the day on September 8, 2022, a DEA Task Force Officer ("TFO") conducted a consent interview of TYQUINN CANNON at his request, during which TYQUINN CANNON stated that he was in the process of moving to Maine and had been en route from Maine to Syracuse, New York, for a court appearance on a pending case when he was stopped. TYQUINN CANNON stated that he was in possession of the drugs and firearm because he was afraid that his apartment in Maine would be burglarized while he was traveling out of state.

13.     Regarding the drugs and firearm found on him and in the vehicle he was operating, TYQUINN CANNON relayed to the TFO that he (TYQUINN CANNON) had purchased both the drugs and firearm from an individual TYQUINN CANNON knew as Aden Mohamed, aka "Mike." TYQUINN CANNON stated that ADEN MOHAMED resided in the town of Monmouth, Maine, and frequented a female associate's residence

located at 144 Annabessacook Road in North Monmouth, Maine. TYQUINN CANNON
stated that the female associate of ADEN MOHAMED was a Caucasian women,
approximately 50 years old, known to him as "Donna."

14.     TYQUINN CANNON identified another criminal associate of ADEN
MOHAMED as "Abdul Issac," who I know to be ABDULLAHI ISSAK, a firearms
trafficker currently awaiting sentencing on firearms charges in the District of Maine in
Case Number 1:22-cr-00135-JAW. TYQUINN CANNON informed the TFO that
ABDULLAHI ISSAK drove a BMW sedan and also resided in Monmouth, Maine.
TYQUINN CANNON stated that ABDULLAHI ISSAK and ADEN MOHAMED distribute
drugs and firearms in and around the Monmouth area of Maine, allegedly obtained from
sources in Boston, Massachusetts. TYQUINN CANNON further stated that ABDULLAHI
ISSAK and ADEN MOHAMED obtained firearms from an older white male known to
TYQUINN CANNON as "Ben" a/k/a "Uncle Ben." TYQUINN CANNON stated that
"Ben" resided at an unknown address in Leeds, Maine. TYQUINN CANNON stated that
"Ben" purchased firearms from an unknown supplier then sold the firearms to
ABDULLAHI ISSAK, ADEN MOHAMED, and others. I know, based on my
investigation, that "Ben" a/k/a "Uncle Ben" is BENJAMIN TURCOTTE.

15.     TYQUINN CANNON further conveyed that he could identify or confirm
the location of Donna's residence in Maine if he was able to refer to the Google Maps
history contained in the application on his cell phone. The TFO retrieved the cell phone
vouchered as TYQUINN CANNON's property and provided it to TYQUINN CANNON.
TYQUINN M. CANNON unlocked the device and reviewed the direction history shown
on the Google Maps application on the device. The Google Maps application on

7

TYQUINN CANNON's cell phone displayed a destination of 144 Annabessacook Road in North Monmouth, Maine.

16.     Based on my training and experience, the items recovered from the satchel held by TYQUINN CANNON as well as from the vehicle he was operating are consistent with drug distribution. For example, the plastic "*corner baggies*" are used by drug dealers, who will fill a *corner* of a sandwich *baggie*, twist it, tie it, and cut off the remainder of the *bag for sale to a drug customer*. In addition to the packaging, the quantity of the drugs seized from TYQUINN CANNON, as well as his admitted possession of the drugs and gun and transport of the same across state lines, is indicative of drug trafficking. I know from my training and experience that drug traffickers often possess firearms under circumstances like those displayed by TYQUINN CANNON—where the firearm was possessed in immediate proximity to a drug "stash"—in order to defend themselves from potential violence arising in the context of drug transactions, as well as to act as a deterrent against those seeking to steal or rob drugs from them.

17.     I know, based on my direct involvement in the investigation of TYQUINN CANNON and others, including ABDULLAHI ISSAK and ADEN MOHAMED, that TYQUINN CANNON's conduct and inculpatory admissions on September 8, 2022, are part of a larger conspiracy to straw purchase and traffic in firearms and controlled substances.

18.     For example, on September 6, 2022, I personally interviewed "Donna," who I know to be DONNA HARRIS, at her residence in North Monmouth, Maine. As TYQUINN CANNON correctly shared with the TFO, DONNA HARRIS resides at 144 Annabessacook Road in North Monmouth, Maine. During my interview of her, DONNA

8

HARRIS admitted that two individuals she identified as "Tony" and "Mikey" had stayed at her residence and sometimes used her car.[4] I know from my investigation that "Tony" is an alias used by ABDULLAHI ISSAK and that "Mikey" is an alias used by ADEN MOHAMED. DONNA HARRIS was otherwise uncooperative. Subsequent to departing, I pulled over near the driveway of 144 Annabessacook Road. While parked, I observed the red 2006 Mazda Tribute with Maine license plate 6009ZB traveling eastbound on Annabessacook Road. I could not discern who was operating or riding in the vehicle, however, this was the same vehicle that TYQUINN CANNON was driving when he was pulled over by the Massachusetts State Police.

19.     I have personally conducted a Vigilant Plate Search Query utilizing Maine License Plate 6009ZB, in order to determine whether the red 2006 Mazda Tribute engaged in substantial interstate travel. From my training and experience, I know that straw purchasers and traffickers of firearms often procure firearms in Maine for re-sale in Massachusetts, New York, and elsewhere. This occurs, in part, because the straw purchasers and traffickers can obtain double or triple the retail price of the firearms by selling it illegally on the black market. Therefore, I know, based on my training and experience, that a travel pattern of numerous trips over a condensed timeframe may be indicative of firearms and/or drug trafficking.

20.     The information I have obtained and reviewed with regard to the red 2006 Mazda Tribute with Maine license plate 6009ZB is indicative of firearms and/or drug trafficking, in that my Vigilant Plate Search Query showed the following:

---

[4] Donna HARRIS indicated that she referred to them each as "Brother", but heard others refer to them as "Tony" and "Mikey."

a.  On August 2, 2022, at approximately 10:15 p.m., the vehicle was captured by a camera located around Interstate 90 westbound in Malden Bridge, New York.  At approximately 11:46 p.m., the vehicle was captured by a camera located around Interstate 90 westbound in Schuyler, New York.

b.  On August 6, 2022, at approximately 5:56 a.m., the vehicle was captured by a camera located around Interstate 90 eastbound in Schuyler, New York.  At approximately 7:24 a.m., the vehicle was captured by a camera located around Interstate 90 eastbound in Malden Bridge, New York.

c.  On August 12, 2022, at approximately 7:05 a.m., the vehicle was captured by a camera located around Interstate 90 westbound in Schodack, New York.  At approximately 8:20 a.m., the vehicle was captured by a camera located around Interstate 90 westbound in Schuyler, New York.

d.  On August 19, 2022, at approximately 12:40 a.m., the vehicle was captured by a camera located around Interstate 90 eastbound in Schuyler, New York.  At approximately 4:51 a.m., the vehicle was captured by a camera located around Interstate 90 eastbound in Malden Bridge, New York.

e.  On August 20, 2022, at approximately 7:54 a.m., the vehicle was captured by a camera located around Interstate 90 westbound in Malden Bridge, New York.  At approximately 9:46 a.m., the vehicle was captured by a camera located around Interstate 90 westbound in Schuyler, New York.

f.  On August 21, 2022, at approximately 6:03 p.m., the vehicle was captured by a camera located around Interstate 90 eastbound in Schuyler, New York.  At approximately 7:50 p.m., the vehicle was captured by a camera located around Interstate 90 eastbound in Malden Bridge, New York.

g.    On August 24, 2022, at approximately 6:18 a.m., the vehicle was captured by a camera located around Interstate 90 westbound in Malden Bridge, New York.  At approximately 6:24 a.m., the vehicle was captured by a camera located around Interstate 90 westbound in Schodack, New York.  At approximately 7:48 a.m., the vehicle was captured by a camera located around Interstate 90 westbound in Schuyler, New York.

h.    On September 4, 2022, at approximately 7:26 a.m., the vehicle was captured by a camera located around Interstate 90 eastbound in Schuyler, New York.  At approximately 9:12 a.m., the vehicle was captured by a camera located around Interstate 90 eastbound in Malden Bridge, New York.

21.    I additionally obtained and review business records from New Hampshire EZ-Pass. The New Hampshire EZ-Pass records showed corresponding travel by the 2006 Mazda Tribute with Maine license plate 6009ZB through the Hookset and Hampton tolls.

22.    On the basis of my investigation, including my review of reports written by the Monmouth, Maine, Police Department personnel, I know that on July 27, 2022, TYQUINN CANNON was stopped operating a vehicle without registration, although the vehicle was not identified in the report, I was provided a dash camera still photo of the vehicle which revealed it to be a red Mazda Tribute. TYQUINN CANNON indicated that he had just purchased the vehicle and produced the bill of sale and title. The vehicle was towed to 144 Annabessacook Road, in Monmouth.

23.    I know that on July 30, 2022, TYQUINN CANNON, ABDULLAHI ISSAK, and ADEN MOHAMED, were observed by a Monmouth, Maine, Police Officer in

Monmouth, Maine. ABDULLAHI ISSAK and ADEN MOHAMED were arrested by the Monmouth Police Officer for violating conditions of release (as they were each on bail conditions preventing them from having contact with each other), and therefore were taken into Maine state custody at the Kennebec County Jail in Augusta, Maine, on July 30, 2022.

24.     On August 1, 2022, I obtained the criminal complaint charging ABDULLAHI ISSAK. As a result of the complaint a federal arrest warrant was lodged as a detainer with state authorities, resulting in ABDULLAHI ISSAK remaining at the Kennebec County Jail through early August. I obtained and listened to recorded jail calls made by ABDULLAHI ISSAK between July 31 through August 3, 2022. My review of the call records shows discussion concerning firearms and drug activity between ABDULLAHI ISSAK, TYQUINN M. CANNON, and ADEN MOHAMED.

25.     For example, several calls contained conversations with and/or references to a male using the alias "Q." I know from my investigation that TYQUINN CANNON has used the alias "Q." During some of the calls, references are made to "Q" bailing out "AD." The Kennebec County Sheriff's Office confirmed to me that TYQUINN CANNON bailed out ADEN MOHAMED on state charges during the same timeframe. During some of the calls, ABDULLAHI ISSAK also referred to "AD" as "Mike," which I know to be an alias used by ADEN MOHAMED. During conversations with his girlfriend, ANGELICA GALARZA, ABDULLAHI ISSAK referred to "Q" holding cash and firearms for him, referred to "Donna," and discussed "Q" travelling to Syracuse. To take one example, on an August 1, 2022, call with ANGELICA GALARZA, ABDULLAHI ISSAK has her put "Q" on the phone.  During their conversation, ABDULLAHI ISSAK and TYQUINN CANNON made references that I understood to pertain to firearms and drugs. ABDULLAHI

ISSAK told TYQUINN CANNON to give ANGELICA GALARZA the "Drake" until he could get her another one. TYQUINN CANNON responded that it was in the trunk. TYQUINN CANNON indicated that he was going with the girl with the BMW. ABDULLAHI ISSAK told TYQUINN CANNON to give ABDULLAHI ISSAK's girlfriend (ANGELICA GALARZA) the "Drake." TYQUINN CANNON indicated that he had "4"bands, and stated that he (TYQUINN CANNON) would try to have "5 or 6" by one or two o'clock. I am aware, by virtue of my training and experience and this investigation, that "Drake" is a slang term for a specific type of firearm, including a Romarm/Cugir, model mini Draco. I know from my investigation that BENJAMIN TURCOTTE, a member of the conspiracy, purchased a Romarm/Cugir model mini Draco at JT Reids Gun Shop in Auburn, Maine, on July 7, 2022.

26.     On September 22, 2022, I obtained a search and seizure warrant from the U.S. District Court for the District of Massachusetts for TYQUINN CANNON's Apple iPhone, which had remained secured as TYQUINN CANNON's personal property during his pretrial detention at the Worcester County Jail & House of Corrections. On September 23, 2022, I travelled to the Worcester County Jail & House of Corrections. There, I met with Sergeant Ryan Bennett, who transferred TYQUINN CANNON's Apple iPhone to my custody pursuant to the search warrant. On that same date, I transported TYQUINN CANNON's Apple iPhone to the New England Regional Computer Forensics Laboratory ("NERCFL") in Chelsea, Massachusetts, and there transferred the cell phone to ATF Special Agent Mattheu Kelsch for forensic examination.

27.     On September 28, 2022, ATF Special Agent Mattheu Kelsch informed me that NERCFL had successfully accessed TYQUINN CANNON's Apple iPhone, thereby enabling the device to be searched. I know from my training and experience that the

process of searching a smartphone, such as an Apple iPhone, involves creating an exact copy or "mirror image" of the device's operating system, all applications, and various forms of data. This mirror image is generated by forensic equipment and associated software which preserves the data without altering it. The forensic device produces a file which allows investigators to review the smartphone data in its native format and in categories based upon applications. TYQUINN CANNON's Apple iPhone was imaged in this manner, using the forensic device to maintain the integrity of the device's internal data while generating a review file for purposes of my search and investigation.

28.     Based on my investigation, I have determined that TYQUINN CANNON maintained a Facebook page bearing the Account Identifier 100051608592644. I have obtained and reviewed certified business records from Facebook specific to this account. These records show the account was active, in that it was logged into on dates ranging from March 31, 2022 through December 22, 2022.

29.     The Facebook business records for Account Identifier 100051608592644 show that the name provided by the account holder was "Tc Quinny," and that the registered email account was "tyquinn2020@yahoo.com." The phone numbers provided by the account holder include (315) 775-9804, which I know from my investigation was a cell phone number associated with TYQUINN CANNON's Apple iPhone. The same iPhone—based on my search of its contents—showed that TYQUINN CANNON's Facebook Account Identifier was 100051608592644, and listed his username as "Tc Quinny."

30.     My review of TYQUINN CANNON's iPhone showed Facetime calls between July 17, 2022 and September 4, 2022, with a user identified as "K Dot" at phone number (315) 957-4580. I know from my discussions with Samantha Monge,

Lead Crime Analyst at the Central New York Crime Analysis Center, that (315) 957-4580 is the contact number for KEELAN MCLAUREN of Syracuse, New York. A Glock, model 27GEN4, .40 caliber pistol, serial number SRR037, and two empty serialized Glock cases, containing serial numbers BWTU427 and BWHN900, were recovered from KEELAN MCLAURIN in Syracuse, NY, on January 19, 2023. According to Lead Crime Analyst Monge, associates of KEELAN MCLAURIN were arrested following a traffic pursuit in Syracuse, New York, on February 9, 2023, during which KEELAN MCLAURIN's associates were observed tossing firearm parts from the vehicle, one such part being a slide recovered from the Glock, model 22, .40 caliber pistol, serial number BWHN900.

a. BENJAMIN TURCOTTE purchased the Glock, model 22, .40 caliber pistol, serial number BWHN900, along with a second Glock pistol, at Northeastern Firearms on July 10, 2022; according to my review of a text message exchange between BENJAMIN TURCOTTE and ABDULLAHI ISSAK on July 10, 2022, BENJAMIN TURCOTTE purchased the firearms on behalf of ABDULLAHI  ISSAK.

b. BENJAMIN TURCOTTE purchased the Glock, model 29 Gen 4, 10mm pistol, serial number BWTU427, along with a second Glock pistol, at Northeastern Firearms on July 13, 2022; according to my review of a text message exchange between BENJAMIN TURCOTTE and ABDULLAHI ISSAK on July 13, 2022, BENJAMIN TURCOTTE purchased the firearms on behalf of ABDULLAHI  ISSAK.

c. BENJAMIN TURCOTTE purchased the Glock, model 27, .40 caliber pistol, serial number SRR037, along with two other Glock pistols and a Taurus

pistol, at Stone Gun Shop on July 16, 2022; according to my review of a text message exchange between BENJAMIN TURCOTTE and ABDULLAHI ISSAK on July 16, 2022, BENJAMIN TURCOTTE purchased the firearms on behalf of ABDULLAHI  ISSAK.

31.     I also know from my review of TYQUINN CANNON's iPhone that he used Facebook's search function on an unknown date to look up "Tamaryn Morin." Based on my investigation, including my review of recorded telephone calls provided to me by the Franklin County Jail, I know that an individual named Tamaryn Morin was in contact with MOHAMED MOHAMED, ADEN MOHAMED, and ANGELICA GALARZA in November 2022.

32.     In Facebook Messenger chats between TYQUINN CANNON and a Confidential Source on September 7, 2022, before his arrest, he tells the Confidential Source he is "outside." I know from my interviews of the Confidential Source that the Confidential Source was a drug customer of TYQUINN CANNON's throughout the summer of 2022, and further, that the Confidential Source rented a vehicle for him and also registered a separate vehicle—the 2006 Mazda Tribute—in the Confidential Source's own name, both at TYQUINN CANNON's request.

33.     Based on my review of TYQUINN CANNON's iPhone, I also reviewed a Facebook Messenger exchange between TYQUINN CANNON and a Facebook account identified as "NBA Quann," dated September 3 and 4, 2022. In their conversation, "NBA Quann" messages TYQUINN CANNON, "East Syracuse," to which TYQUINN CANNON responds, "Yea." Later in the conversation, "NBA Quann" messages TYQUINN CANNON, "Sell me a gram," which I understand to be a reference to "NBA Quann" asking TYQUINN CANNON to sell him ("NBA Quann") a controlled substance.

16

34.     I know from my communications with ATF Special Agent Richard Gardiner, of the ATF Syracuse Field Office, that "NBA Quann" is UQOEON LAWRENCE, of Syracuse, New York. On April 11, 2023, Special Agent Gardiner received a Facebook search warrant return from a search warrant authorized by the U.S. District Court for the Northern District of New York for the content of UQOEON LAWRENCE's Facebook account, Account Identifier 100072466149619. Special Agent Gardiner provided me with a copy of Facebook Messenger communications exchanged between UQOEON LAWRENCE's Facebook account and TYQUINN CANNON's Facebook account.

35.     My review of the Facebook Messenger communications exchanged between UQOEON LAWRENCE's Facebook account and TYQUINN CANNON's Facebook account identified numerous discussions concerning firearms and drug trafficking, examples of which are provided below.

a.     On February 6, 2022, TYQUINN CANNON sends UQOEON LAWRENCE the following picture of a handgun, followed by the message, "Who need one."



b.    On May 19, 2022, TYQUINN CANNON sends UQOEON LAWRENCE the following picture of a handgun,



to which UQOEON LAWRENCE responds, "I need oneee." TYQUINN CANNON then replies, "I got you," and, "Just get the money and I'll go get you something nice with money up front just let me know when you want me to pick the money up."

c.    On May 24, 2022, TYQUINN CANNON sends UQOEON LAWRENCE the following picture of a handgun,



to which UQOEON LAWRENCE responds, "On my way now Cus."
TYQUINN CANNON then replies, "800 cuz let him know before y'all hit
the road." UQOEON LAWRENCE responds, "Brotty I know just bring ya
ass we on the thru way money ain't the issue at all with my pops." Later in
the message thread TYQUINN CANNON provides UQOEON LAWRENCE
with the address 185 Grafton Drive, Portsmouth, New Hampshire, which
based on an Internet search, is the address of C&J Bus Lines.

d.    On May 27, 2022, UQOEON LAWRENCE asks TYQUINN CANNON, "You
know anybody that pop with ice?"[5] TYQUINN CANNON responds, "Yea."
UQOEON LAWRENCE writes back, "I got it 260 a oz." TYQUINN
CANNON responds, "I got people's out here." UQOEON LAWRENCE
writes back, "Get with me," to which TYQUINN CANNON replies, "Ok."

---

[5] I know, based on my investigative experience, that "ice" is a street name for methamphetamine.

e.   On June 28, 2022, TYQUINN CANNON sends UQOEON LAWRENCE
three pictures of Glock handguns, then tells UQOEON LAWRENCE to
"make sure it's a go for all." UQOEON LAWRENCE initially tells
TYQUINN CANNON to "just bring the two."

f.   On July 4, 2022, TYQUINN CANNON sends UQOEON LAWRENCE the
following picture of a handgun with what appears to be a KCI USA 9mm
Glock 50 round "drum" magazine,



to which UQOEON LAWRENCE responds, "sold."

g.   On July 11, 2022, TYQUINN CANNON sends UQOEON LAWRENCE the
following picture of a Glock handgun,



to which UQOEON LAWRENCE responds, "I need pictures of the 22 so I could sell it."

h.  On July 20, 2022, in what I believe to be references to specific model numbers for Glock handguns, TYQUINN CANNON sends UQOEON LAWRENCE a message, "Two19s,30s,43x." UQOEON LAWRENCE responds, "Brotty want the 43 but he in New York till the morning he cash ready tho." TYQUINN CANNON responds, "Got you I'll put it to the side." I know from my investigation that on July 19, 2022, BENJAMIN TURCOTTE purchased a Glock, model 43X, 9mm pistol, serial number BUEH130, at Spin Drift Firearms in Leeds, Maine. On that same date, ABDULLAHI ISSAK sent BENJAMIN TURCOTTE a text message, "Call tht shop in Leeds and ask if they got 43 or any other 9m glocks." BENJAMIN TURCOTTE responded, "They have new 43 chop chop."

i.  On September 3, 2022, UQOEON LAWRENCE asks TYQUINN CANNON, "You got hard," in a reference I understand, based on my investigative experience, to mean crack cocaine. TYQUINN CANNON responds, "Yea." UQOEON LAWRENCE then writes, "Give me like .7 we split it 50/50." TYQINN CANNON responds, "For how much." UQOEON LAWRENCE responds, "50 niggah."

36.  On the basis of the foregoing, I accordingly believe that the search of the Facebook account associated with Account Identifier 100051608592644 will contain evidence of violations of TYQUINN CANNON's participation in the criminal activity discussed above.

37.  More particularly to Facebook, the company owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos and other information with other Facebook users, and sometimes with the general public.

38.  Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user identification number to each account.

39.  Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook

22

assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

40.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

41.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her

23

"Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

42.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

43.     Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

44.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

45.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as

well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

46.    Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

47.    Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

48.    Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

49.    In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

50.    Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that

the user viewed the profile, and would show when and from what IP address the user did so.

51.    Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

52.    As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account.[6] Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along

---

[6] This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time.

with the time and date.  By determining the physical location associated with the logged

IP addresses, investigators can understand the chronological and geographic context of

the account access and use relating to the crime under investigation. Such information

allows investigators to understand the geographic and chronological context of

Facebook access, use, and events relating to the crime under investigation. Additionally,

Facebook builds geo-location into some of its services. Geo-location allows, for example,

users to "tag" their location in posts and Facebook "friends" to locate each other.  This

geographic and timeline information may tend to either inculpate or exculpate the

Facebook account owner. Last, Facebook account activity may provide relevant insight

into the Facebook account owner's state of mind as it relates to the offense under

investigation. For example, information on the Facebook account may indicate the

owner's motive and intent to commit a crime (e.g., information indicating a plan to

commit a crime), or consciousness of guilt (e.g., deleting account information in an

effort to conceal evidence from law enforcement).

53.     Therefore, the servers of Facebook are likely to contain all the material

described above, including stored electronic communications and information

concerning subscribers and their use of Facebook, such as account access information,

transaction information, and other account information.

### CONCLUSION

54.     Based on the foregoing, I request that the Court issue the proposed search

warrant.

55.     On October 14, 2022, I requested pursuant to Title 18, United States Code,

Section 2703(f), the preservation of all stored communications, records, and other

evidence in Facebook's possession regarding the account at issue. Facebook confirmed

via email to me that same day that it had taken reasonable steps to preserve the accounts requested, providing reference case number 7296957. On April 11, 2023, I obtained from Facebook an extension of the same preservation request. In addition, I have confirmed via Internet searches that portions of the Facebook account remain publicly viewable. I therefore believe that the evidence sought is presently available and maintained by Facebook.

56.     The Government will execute this warrant by serving it on Facebook. Because the warrant will be served on Facebook, and Facebook will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

57.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense[s] being investigated." 18 U.S.C. § 2711(3)(A)(i).

58.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Dated at Bangor, Maine,
this 21st day of June, 2023.

Christopher Concannon
Special Agent
Bureau of Alcohol, Tobacco,
Firearms and Explosives

Sworn to telephonically and signed
electronically in accordance with the
requirements of Rule 4.1 of the Federal Rules
of Criminal Procedure

Date: Jun 21 2023

City and state:        Bangor, ME

Judge's signature

John C. Nivison U.S. Magistrate Judge
Printed name and title